## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:15-cr-00139-JAW-01 |
| | ) | |
| DARRIN CATES | ) | |

### ORDER ON MOTION FOR COMPASSIONATE RELEASE

A federal inmate serving a ten-year sentence for possession of child pornography moves for compassionate release to home confinement followed by a period of supervised release under 18 U.S.C. § 3582(c)(1)(A)(i). The nature and seriousness of the inmate's offense, the risk he poses to the community from the circumstances of his crime and prior incidences of sexual conduct with an eight-year-old girl, and the lack of medical conditions, other than smoking, which present an increased risk of complications from COVID-19, all weigh against his release. The Court denies his motion.

## I.   PROCEDURAL BACKGROUND

On April 25, 2017 the Court sentenced Darrin Cates to one-hundred and twenty months of imprisonment, followed by ten years of supervised release after he pleaded guilty to a one-count indictment for possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and § 2252A(b)(2). *Min. Entry* (ECF No. 85); *J.* (ECF No. 87). The Court ordered Mr. Cates to pay $20,000.00 in total restitution to his four victims along with a $100.00 special assessment. *J.* at 6. Mr. Cates filed his notice of appeal that same day. *Def.'s Notice of Appeal* (ECF No. 89). On July 25, 2018 the First Circuit affirmed this Court's sentence. *J.* (ECF No. 111); *United States*

*v. Cates*, 897 F.3d 349 (1st Cir. 2018).  The Court received the First Circuit's mandate on August 16, 2018.  *Mandate* (ECF No. 112).

On June 26, 2020, Darrin Cates moved pro se for compassionate release pursuant to the First Step Act and requested that the Court appoint counsel.  *Def.'s Mot. for Compassionate Release and to Appoint Counsel* (ECF No. 119) (*Def.'s Pro Se Mot.*).  On July 8, 2020 the Court appointed counsel and set a seven-day deadline for an Amended Petition for Compassionate Release.  *Appointment of Counsel and Scheduling Order* (ECF No. 122).  After several unopposed motions to extend time, Mr. Cates filed his amended petition on August 26, 2020.  *Def.'s Suppl. Mot. to Reduce Sentence for Compassionate Release* (ECF No. 130) (*Def.'s Mot.*).  The Government responded on September 1, 2020.  *Gov't's Resp. to Def.'s Mot. to Reduce Sentence for Compassionate Release* (ECF No. 131) (*Gov't's Opp'n*).  Mr. Cates did not file a reply.

## II.     POSITIONS OF THE PARTIES

### A.     Darrin Cates' Motion

Mr. Cates contends that compassionate release is proper under 18 U.S.C. § 3582(c)(1)(A) because his health conditions, combined with the conditions within FCI Danbury present "extraordinary and compelling reasons" justifying his release.  *Def.'s Mot.* at 1.  Mr. Cates states that he has various health issues.  In addition to having "respiratory complications and issues" he states that he has "disc degenerative disease and mental health issues of Autism, Asperger's and depression."  *Id.*  He states that because of these conditions "[h]e is at imminent risk of contracting

COVID-19 which feeds on the unsafe, congregate conditions at [FCI Danbury]." *Id.* at 2.

According to Mr. Cates, FCI Danbury "has been subject to several outbreaks of COVID-19 and has at least one prisoner death." *Id.* He notes that the facility houses approximately 728 men across thirteen different housing units. *Id.* Mr. Cates claims that he is housed in a dormitory style unit where he "sleeps within 3-4 feet of five other men." *Id.* He indicates that the bathroom he uses has "5 stalls and a urinal and 5-6 sinks . . . and a shower area two feet across the hall with 3-4 showers." *Id.* He also asserts that "[t]he outbreak at FCI Danbury is an extraordinary circumstance" and that an April, 2020 memorandum from Attorney General William Barr to the Bureau of Prisons (BOP) "acknowledged the 'significant levels of infection' at FCI Danbury along with two other facilities." *Id.* at 3. Mr. Cates further alleges that FCI Danbury "has been unable to follow CDC guidelines to prevent health risks to the inmates" and contends that "[t]here are institutional deficiencies in social distancing, screening and testing, isolation and quarantine, sanitation and hygiene, personal protective equipment and medical treatment for other conditions." *Id.* He also cites and attaches *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350 (D. Conn. May 12, 2020) and *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 U.S. Dist. LEXIS 94038, 2020 WL 2813072 (D. Conn. May 29, 2020), which describe conditions in FCI Danbury. *Id.* at 4-5 (collectively cited as *Martinez-Brooks*).

Mr. Cates concludes by arguing that release is proper. *Id.* at 4. He contends that he has met § 3582(c)'s exhaustion requirements, that extraordinary and compelling reasons warrant a reduction of sentence, that he poses no danger to the community, and that the reduction in sentence is consistent with the relevant policy statement. *Id.* He also notes that he "has established a safe release plan for home confinement at his home in Winslow, Maine." *Id.* at 5.

Mr. Cates attached six filings to his motion for compassionate release. First, he attaches his initial request for release to home confinement he filed in May 2020 with the warden at FCI Danbury. *Def.'s Mot.* Attach. 1, *Req. for Release to Home Confinement Pursuant to 18 U.S.C. § 3624(c)(2) or Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for Inmate Darrin Cates* (*BOP Pet.*). This attachment contains a handwritten list of his medical conditions, medications, and a release plan. *Id.* at 5-7.

Second, Mr. Cates attaches the BOP's denial of his request for release dated June 3, 2020. *Id.* Attach. 2, *Resp. to Inmate Req. to Staff Member* (*BOP Resp.*). In that response, the BOP explained to Mr. Cates that under BOP Program Statement No. 5050.50 he was ineligible for release. *Id.* at 1. The BOP informed Mr. Cates that he had "not been diagnosed with a respiratory condition such as COPD, pulmonary fibrosis, or cystic fibrosis which are conditions identified as groups at higher risk for severe illness from COVID-19." *Id.* The BOP told Mr. Cates that it reviewed his request for home confinement under the CARES Act; however, it informed him that he was "ineligible due to [his] conviction of a sex crime." *Id.* The BOP also observed

4

that while in prison, he has been sanctioned for two incidences of drug use and for mail abuse but that he has "a low risk of recidivism." *Id.*

Third, Mr. Cates attached his initial pro se motion to the Court for compassionate release. *Id.*, Attach. 3, *Letter to Judge Woodcock* (*Def.'s Pro Se Mot.*). Fourth, he attached a document detailing his crimes and expected release date of September 4, 2024. *Id.*, Attach. 4, *Sentence Monitoring Computation Data.* Fifth and sixth, he attached the *Martinez-Brooks v. Easter* decisions. *See id.*, Attachs. 5, 6.

## B.    The Government's Opposition

The Government opposes releasing Mr. Cates for two reasons.  First, the Government contends that "he has not met his burden to show extraordinary circumstances exist in his case to warrant the reduction in sentence." *Gov't's Opp'n* at 1.  Second, the Government notes that "even if his case were exceptional, he fails to meet his burden in showing that a reduction of sentence would be appropriate in light of the continuing danger he poses to the community." *Id.*

To begin, the Government highlights the threat which COVID-19 poses. *Id.* at 2.  The Government flags that the "BOP has had a Pandemic Influenza Plan in place since 2012" and that the plan allowed the BOP to begin "planning for potential coronavirus transmissions in January." *Id.*  Next, the Government describes the BOP's COVID-19 protocols for testing, use of masks, social distancing, treatment, quarantining, and visitation. *Id.* at 3-6.  The Government asserts that "[t]aken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Id.* at 6.  Despite these protocols, the

Government informs the Court that as of the date it filed its opposition, eighty-five inmates and sixty-three staff at FCI Danbury have been diagnosed with and recovered from COVID-19; however, one inmate died.  *Id.*

Turning to the merits of Mr. Cates' petition, the Government contends that Cates "has not established 'extraordinary and compelling reasons' for [compassionate release] within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement."  *Id.* at 10.  According to the Government "[t]he mere existence of the COVID-19 pandemic" is not an extraordinary and compelling circumstance and "therefore cannot alone provide a basis for a sentence reduction."  *Id.* at 11-12 (citing *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)).  As such, the Government considers whether Mr. Cates' medical conditions "place [Mr.] Cates within groups that are acknowledged by the Centers for Disease Control and Prevention (CDC) to be at higher risk."  *Id.* at 12.

The Government notes that Mr. Cates' pro se petition for release claims that he has "'smoker's cough from COPD,' 'wet lung,' 'inhaler for asthma,' and 'respiratory complications and issues.'"  *Id.*  However, the Government argues that "[u]pon closer examination . . . it is apparent that the conditions do not constitute extraordinary and compelling reasons for his release."  *Id.*  Rather, the Government argues that the CDC has deemed only "serious heart conditions such as heart failure, and serious lung conditions such as COPD" as putting individuals at high risk.  *Id.* at 13.  Citing FCI Danbury's decision to deny compassionate release, the Government writes that "[Mr.] Cates alleges he has COPD, but according to his own document (Def.'s Ex. B), he has

not been diagnosed with COPD or any other condition that would put him at a higher risk for severe illness from COVID-19." *Id.* The Government attaches Mr. Cates' BOP medical records to its opposition, which confirm he does not have COPD. *Gov't's Opp'n*, Attach. 1, *Bureau of Prisons Health Servs. Clinical Encounter* at 64 (ECF No. 131-1) (*Med. Records*). As to Mr. Cates' claims that he has degenerative disc disease, depression, Asperger's and Autism, the Government points out that the CDC has released no guidance indicating that these conditions increase Mr. Cates' risk of serious complications from COVID-19. *Id.* at 13-14.

Next, the Government argues that Mr. Cates "poses a continuing danger to the community in light of his history of child pornography activity and past sexual abuse of a minor child." *Id.* at 10. It asserts that Mr. Cates' failure to show he is not a danger to the community and the sentencing factors under 18 U.S.C. § 3553(a) "strongly disfavor a sentence reduction." *Id.* at 14. Specifically, the Government observes that Mr. Cates "has served only approximately forty-seven percent of his full term of imprisonment." *Id.* The Government argues that Mr. Cates' "criminal history, his disciplinary record while incarcerated at BOP, prior conduct involving child pornography, and sexual abuse of a minor child" suggest he still poses a danger to the community. *Id.* at 15.

Regarding his criminal history, the Government points out that Mr. Cates has seven convictions for burglary between 1988 and 1989, among other offenses, and had his probation revoked numerous times. *Id.* The Government also notes that Mr.

Cates' last conviction, prior to his federal child porn conviction, was a 2008 conviction for disorderly conduct.  *Id.*

Regarding Mr. Cates' behavior in prison, the Government observes that Mr. Cates has had several disciplinary incidents since entering BOP custody.  *Id.* According to the Government, Mr. Cates has been involved with five incidents in the past year, including "phone abuse, possessing drugs/alcohol on two occasions, possessing unauthorized item, and mail abuse/disrupt monitoring."  *Id.*

Finally, the Government considers how Mr. Cates' criminal conduct should factor in to the Court's decision-making.  The Government quotes from the Court's statements at sentencing that "child pornography is, by its very definition a crime that victimizes a class of human beings – children – who are unable to protect themselves, and because it is a crime against children, it is also a crime that has devastating consequences on society's most vulnerable."  *Id.* at 16.  The Government argues "there is little indication that [Mr.] Cates is able to control his urges to search for and possess images of child sexual abuse" and "[h]e has put forward no evidence that he no longer presents a danger to the community."  *Id.* at 17.

## III.   LEGAL STANDARD

In relevant part, 18 U.S.C. § 3582(c)(1)(A)(i) states:

> The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the

> term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Before a court considers a defendant's motion for compassionate release, it must determine that the defendant has met the procedural prerequisites for bringing such a motion. *See United States v. Lugo*, No. 2:29-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (finding the exhaustion or thirty-day requirement of section 3582(c) mandatory). When, as here, a defendant shows exhaustion, a court must consider the merits and determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." *Id.*

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A). The Guidelines note that the movant must meet the "requirements of subdivision (2) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Subdivision (2) provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). . .."

Section 3142(g) sets forth the factors a court should consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release. They include (1) the nature and circumstances of

the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  Regarding the history and characteristics of the person, the statute provides that the court must consider:

> (A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . ..

18 U.S.C. § 3142(g)(3)(A-B).  After a court has determined whether the defendant is dangerous, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant.   U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

When it sentenced Mr. Cates, the Court relied upon a Revised Presentence Investigation Report (PSR) prepared by the United States Probation Office (PO).  At sentencing, Mr. Cates admitted that the PSR was largely accurate.[1] To the extent

---

[1]      At the sentencing hearing, Mr. Cates contested paragraphs seven, ten and thirteen A of the PSR.  *Tr. of Proceedings* at 4:20-7:19 (ECF No. 104) (*Sentencing Tr.*).  Based in part on his dispute about these paragraphs, he objected to the Court's guideline calculation.  *Id.*  Paragraph seven detailed allegations that Mr. Cates had sexually abused an eight-year-old girl about seventeen years earlier.

that Mr. Cates objected to the Court's fact-finding at the sentencing hearing, the First Circuit affirmed the District Court's rulings on these objections. *United States v. Cates*, 897 F.3d 349, 354-60 (1st Cir. 2018).

### 1.    Darrin Cates' History and Characteristics

Darrin Cates was born in 1969 in Augusta, Maine. *Revised Presentence Investigation Report* ¶ 53 (ECF No. 121-1) (*PSR*). His biological parents put him up for adoption immediately after he was born, and he never knew them. *Id.* Mr. Cates was placed into foster care. *Id.* When he was two, he was placed with Dianne and Gerald Cates who adopted him when he was six years old. *Id.* At fifteen, Mr. Cates became emancipated and moved in with a friend in Waterville, Maine. *Id.* He graduated from Winslow High School in 1988 near the bottom of his class. *Id.* ¶ 62. Mr. Cates enrolled in college at the University of Maine at Augusta in 1989 but withdrew after less than a semester. *Id.* ¶ 63. In 1991, he enrolled in four courses at University of Maine at Presque Isle but received a failing grade in all four. *Id.* Between 1995 and his 2015 conviction for child pornography, Mr. Cates was self-employed as a web developer. *Id.* ¶ 64.

On July 3, 1999, Mr. Cates married Jessica Reynolds. *Id.* ¶ 54. The couple had two daughters and lived in Winslow, Maine. *Id.* Apart from a year of

---

PSR ¶ 7. Paragraph ten set forth the PO's application of the pattern of conduct enhancement under United States Sentencing Guideline § 2G2.2(b)(5) based on the conduct in paragraph seven. *Id.* ¶ 10. Paragraph 13A described Mr. Cates' attempt to influence his father to alter Mr. Cates' personal history in an effort to obtain a more lenient sentence. *Id.* ¶ 13A. The Court ruled against Mr. Cates' objections to paragraphs seven and ten based on its conclusion that he had engaged in a pattern of conduct under § 2G2.2(b)(5) but agreed with Mr. Cates that his interaction with his father did not justify denying a three-point guideline reduction for his acceptance of responsibility, a determination that favored Mr. Cates. *Sentencing Tr.*, at 4:20-7:19.

incarceration at the Maine State Prison in Windham, Maine, Mr. Cates' life was free of major crises until his present offense. *Id.* ¶ 55. He told the PO that his life was "excellent" until January 8, 2015 when his mental health began to decline. *Id.* ¶ 56. He said that after that date, he lost thirty-five pounds and began to cry every day. *Id.* He attributes the crying and mental distress to his time in foster homes and related separation anxiety. *Id.*

At the time of sentencing, Mr. Cates represented that he was in good physical health. *Id.* ¶ 58. He indicated that his only health problem was a compressed disc and pinched nerve in his back. *Id.* The PSR states that Mr. Cates first sought mental health treatment after his criminal conduct was discovered. *Id.* ¶ 59. It also indicates that he was diagnosed at that time with depression, anxiety, and insomnia. *Id.* Mr. Cates denied any history of alcohol or substance abuse. *Id.* ¶ 61. However, the BOP recently found him in possession of Suboxone. *Gov't's Opp'n*, Attach. 2, *Inmate Discipline Data* at 1-2 (ECF No. 131-2) (*Disciplinary Record*).

### 2.    Criminal History

Mr. Cates has been convicted of numerous crimes, though the bulk are several decades old. Between June 19, 1988 and November 5, 1989, when Mr. Cates was nineteen and twenty years old, he was convicted of a series of property offenses, including several burglaries which resulted in a one-year prison term. *PSR* ¶¶ 31-39. He also has several convictions for motor vehicle offenses, namely, operating after suspension. *Id.* ¶¶ 32-41, 44. In 1998 he was convicted of assault and paid a $150 fine. *Id.* ¶ 42. He has a conviction stemming from a 2003 episode of disorderly

conduct at the Waterville House of Pizza in Waterville, Maine. *Id.* ¶ 43. He has another disorderly conduct conviction arising from his 2008 use of offensive words and gestures at a McDonald's drive-thru window. *Id.* ¶ 45. He was fined $250 for this crime. *Id.* Mr. Cates aged out of these convictions for purposes of Guideline calculation and he was assessed a criminal history score of zero. *Id.* ¶ 46. He has a criminal history category of I. *Id.*

### 3.    Nature and Circumstances of the Offense

Mr. Cates' conviction resulted from an investigation by the Maine State Police Computer Crimes Unit (MCCU). *PSR* ¶ 5. An investigative assistant with MCCU determined that an IP address had shared files of interest in a child pornography investigation through a Peer to Peer network. *Id.* Investigators determined that the IP address belonged to Mr. Cates. *Id.* Investigators accessed the IP address on December 31, 2014 and determined that the IP address had shared thirty-six unique torrents of child pornographic material of interest between September 15, 2014 and October 30, 2014. *Id.*

For example, one video file shared via the torrent depicted extremely graphic and sadistic sexual activity on a young girl, including violation by an animal. *Id.* Based on this video and others discovered during the investigation, the MCCU obtained a search warrant for Mr. Cates' residence in Winslow. *Id.* MCCU agents executed a search warrant of Mr. Cates' residence on January 9, 2015. *Id.* ¶ 6. Agents seized a homemade desktop computer, two WD drives, and three thumb drives. *Id.* While agents were executing the warrant, Mr. Cates voluntarily agreed to an

13

interview. *Id.* He told investigators that he had been downloading child pornography for about three years and had several billion images and videos saved. *Id.* However, officers did not locate billions of images. *Id.* Mr. Cates denied ever engaging in unlawful sexual contact but stated that one of his daughter's friends had complained of a "three-way hug" to the Maine Department of Health and Human Services when the friend became uncomfortable. *Id.*

Mr. Cates' 2015 arrest caused a prior victim to come forward. On January 11, 2015, a confidential source of information (SI) called the MCCU to report that Mr. Cates sexually abused her. *Id.* ¶ 7. The SI, then aged twenty-five, claimed that the abuse took place when she was around eight years old in 1997. *Id.* She informed the MCCU that Mr. Cates was her mother's boyfriend at the time and had on two separate occasions, forced her to watch him masturbate. *Id.* During one instance, she stated that Mr. Cates made her perform oral sex on him. *Id.* She further alleged that Mr. Cates told her not to tell her mother about the abuse and threatened to do something to her mother if she did. *Id.* The SI said she reported the incident to her mother and step-brother a few years later after she saw Mr. Cates with his wife and their child, and it upset her. *Id.* In May 2001, the SI's mother informed police of the allegations of abuse and on May 24, 2001 law enforcement interviewed the SI. *Id.* Law enforcement interviewed Mr. Cates on May 25, 2001 and he denied the allegations. *Id.* Mr. Cates was not charged for this conduct. *Id.*

On January 15, 2015, Mr. Cates agreed to a voluntary interview with MCCU. *Id.* During the interview he admitted having a substantial amount of child

pornography on his hard drive. *Id.* He stated that the children in these images ranged from babies to teenagers, but that he preferred young girls aged between eight and twelve. *Id.* He again denied contact offenses. *Id.* However, when asked if the SI had watched him masturbate while he was watching pornography, he stated "that sounds like something that may have happened." *Id.* At first, he denied the SI had ever touched his penis, but he later contradicted himself. *Id.* He stated that on one occasion, the SI had come into the room where he was, stuck her hand on his leg under his shorts, and grabbed his penis. *Id.* According to Mr. Cates, he immediately got up and left the room. *Id.* He denied forcing the SI to perform oral sex. *Id.*

MCCU investigators conducted a forensic analysis of the electronic devices taken from Mr. Cates' home. *Id.* ¶ 8. They recovered 550 images and 296 videos of child porn from an external hard drive. *Id.* An additional 276 images and two movies were recovered from a USB drive. *Id.* After consulting with the National Center for Missing and Exploited Children, MCCU investigators determined that 398 images and 103 videos were of known child victims. *Id.*

The PO reviewed the images and videos in this case on January 5, 2016 at the U.S. Attorney's Office in Bangor, Maine. *Id.* ¶ 9. Some depict horrifically violent instances of child sex abuse. *Id.*

## B.   Darrin Cates' BOP Medical Records

The Government submitted sixty-seven pages of Mr. Cates' medical records to the Court. *Med. Records.* A record dated March 27, 2020 says that Mr. Cates has Autism Spectrum Disorder and a Personality Disorder with Dependent Tendencies.

*Id.* at 52-53.  He was also diagnosed at that time with Opioid Use Disorder after he tested positive for Suboxone.  *Id.* at 53.  He has degenerative disc disease.  *Id.* at 4.

On June 10, 2020, Mr. Cates had an appointment with BOP health services and raised concerns about a pulmonary condition.  *Id.* at 4-5.  His providers observed that he was wheezing but had no crackling in his lungs or sounds indicating diminished breath.  *Id.* at 5.  He had a regular heart rate and rhythm.  *Id.*  His provider prescribed an Albuterol inhaler for his wheezing and Amitriptyline tablets for depression and low back pain.  *Id.* at 6.  On June 18, 2020 he had a scan to assess whether he had COPD and the scan found no radiographic evidence of COPD.  *Id.*

### C.    Darrin Cates' BOP Disciplinary Records

The Government attached two pages of Mr. Cates' disciplinary records from the BOP.  *Gov't's Opp'n*, Attach. 2, *Inmate Discipline Data* (ECF No. 131-2) (*Disciplinary Record*).  The record describes five violations by Mr. Cates.  *Id.* at 1-2.  On August 1, 2019 he was found to have abused his phone privileges by committing a prohibited act.  *Id.* at 2.  On September 13, 2019 he was sanctioned for concealing Suboxone in his rectum.  *Id.* at 1-2.  On October 10, 2019 he was sanctioned for having an unauthorized item in his mattress.  *Id.* at 1.  On October 11, 2019, he was found to have committed mail abuse.  *Id.*  On January 5, 2020, he admitted to testing positive for Buprenorphine.  *Id.*

### D.    Guideline Calculations and Sentence

The Court calculated a total offense level of thirty-five and a Criminal History Category of I, which yielded a guideline range of 168 to 210 months imprisonment, a

period of supervised release ranging from five years to life, and a fine ranging from $20,000.00 to $200,000.00. *Statement of Reasons* at 1 (ECF No. 88). *Id.*, Attach. 1, *Findings Affecting Sentencing* (ECF No. 88-1) (*Findings*). Mr. Cates' guideline range included several enhancements which nearly doubled his base offense level from eighteen to thirty-five. *Id.* He received a two-level enhancement because his offense involved a prepubescent minor who had not yet attained the age of twelve, a two-level enhancement for distributing the child pornography through a Peer to Peer network, a four-level enhancement because the material portrayed sadistic or masochistic content, a five-level enhancement for engaging in a pattern of activity involving sexual abuse or exploitation of a minor, a two-level enhancement for using a computer, and a five-level enhancement because the offense involved more than 600 images. *Id.* ¶¶ 3-8. He received a two-level reduction for acceptance of responsibility and an additional one-level reduction. *Id.* ¶¶ 9-10.

Due to the punitive nature of the child pornography guidelines, the Court imposed a downward variant sentence of 120 months. *Statement of Reasons* at 3. The Court also imposed a ten-year term of supervised release. *J.* at 3. As Mr. Cates was subject to mandatory restitution under 18 U.S.C. § 2259, the Court ordered Mr. Cates to make restitution to four of his victims in the total amount of $20,000. *Id.* at 6. The Court ordered the $100 special assessment. *Id.*

## V.    DISCUSSION

### A.    The Danger to the Community

The Court concludes that Mr. Cates has failed to show that he is no longer a danger to the safety of any other person in the community.  Under 18 U.S.C. § 3142(g) the Court must determine whether the defendant has a history of controlled substance offenses or crimes of violence.  The Court must also consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law . . .." 18 U.S.C. § 3142(g)(3)(B).

Putting aside Mr. Cates' prior criminal history due to its age, there are two major issues that concern the Court about Mr. Cates' risk of recidivism: first, the nature of the child pornography Mr. Cates possessed and second, his actual sexual contact with an eight-year-old girl.  In the spectrum of child pornography, the images Mr. Cates chose to possess were extremely abusive; they depicted graphic and violent sexual abuse of children as young as babies.  *PSR* ¶¶ 5, 8-9.  The amount of pornography in Mr. Cates' possession suggested "a significant degree of obsession." *Sentencing Tr.* at 80:19.    Furthermore, Mr. Cates crossed a significant boundary when he engaged in sexual activity on two occasions with an eight-year-old girl.  *PSR* ¶ 7.  As the Court observed at Mr. Cates' sentencing hearing, a sexual obsession with young children means that society's most vulnerable, its children, are potential victims and the consequences of sexual abuse of a child on the victim are often devastating.  *Sentencing Tr.* at 81:1-6.  Finally, the Court is concerned about his multiple disciplinary violations while at the BOP, including possession of Suboxone;

these disciplinary violations raise doubts about Mr. Cates' self-discipline and willingness to follow society's rules. *Disciplinary Records* at 1-2. Furthermore, the BOP has diagnosed Mr. Cates with Opioid Use Disorder, which presents another risk factor. *Med. Records* at 45.

The Court finds that Mr. Cates poses a continuing danger to the community and this finding alone is sufficient to deny his motion for compassionate release.

### B.      The 3553(a) Factors

At Mr. Cates' sentencing, the Court analyzed the § 3553(a) factors including the nature and circumstances of his offense, his history and characteristics, and the need to protect the public from future crimes perpetrated by Mr. Cates. *Sentencing Tr.* at 76:1-9. In the Court's view, nothing has changed since it sentenced Mr. Cates. His crimes are as deplorable as they were at sentencing. Moreover, the Court maintains that the downward variance he received at sentencing makes his 120-month sentence no more severe than necessary to accomplish the purposes of the law.

### C.      Darrin Cates and COVID-19

#### 1.      Darrin Cates' Health Conditions

There is no evidence that Mr. Cates has a health condition that places him at a heightened risk of serious medical complications should he contract COVID-19. According to the Centers for Disease Control and Prevention (CDC) the risk of getting severely ill from COVID-19 increases as a person gets older. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Oct. 19, 2020). Eighty percent of COVID-19 deaths in the

United States have been persons aged sixty-five or older. *Id.* The CDC has also identified several underlying medical conditions that put a person at increased risk of severe illness from COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 19, 2020). These conditions include: cancer, chronic kidney disease, COPD, weakened immune system from an organ transplant, obesity (defined as a body mass index (BMI) of thirty or higher), serious heart conditions such as heart failure, sickle cell disease, and Type 2 diabetes. *Id.* The CDC has also suggested that smokers are at increased risk for complications. *Id.*

According to his medical records, other than smoking, Mr. Cates has none of the medical conditions that would put him at an increased risk of serious complications from COVID-19. Mr. Cates was born in June 1969. *PSR* at 2. He is fifty-one years old and therefore his age does not put him at a substantially heightened risk of complications from COVID-19. Second, there are no diagnoses in Mr. Cates' medical records that weigh in favor of release. As mentioned, a recent scan revealed that he did not have COPD. *Med. Records* at 64. There is no evidence that he is obese. He has degenerative disk disease, Autism Spectrum Disorder, and Opioid Use Disorder. *Id.* at 52-53. His only CDC-recognized health risk is that he has been a heavy smoker for thirty years. *Id.* at 4. Although his smoking risk factor is a concern, it is the only risk factor he presents. On balance, the Court finds that Mr. Cates' health does not present an extraordinary and compelling circumstance justifying his release because his conditions do not put him at an appreciably greater

risk that the average inmate of suffering a severe illness should he contract COVID-19

### 2.     FCI Danbury and COVID-19

The Court now considers how likely it is that Mr. Cates will contract COVID-19 at FCI Danbury.  According to Mr. Cates, FCI Danbury "has been subject to several outbreaks of COVID-19 and has at least one prisoner death" and "[d]espite court orders the facility has been unable to provide safe housing for prisoners."  *Def.'s Mot.* at 2.  The Government does not address the particular dangers posed by COVID-19 at FCI Danbury but highlights the efforts of the BOP nationwide to mitigate its harmful effects on inmates.  *Gov't's Opp'n* at 2-7.

Located in Danbury, Connecticut, FCI Danbury is a low-security federal correctional institution.  *FCI Danbury*, BOP, https://www.bop.gov/locations/institutions/dan/ (last visited Oct. 19, 2020).  It has an adjacent low-security satellite prison and a minimum-security satellite camp.  *Id.*  It houses 874 inmates, with 686 at the FCI, 57 inmates in the camp, and 131 inmates at the low security satellite prison.  *Id.*  Eight hundred and seventy-six inmates at Danbury FCI have been tested for COVID-19 and eighty-six have tested positive.  *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Oct. 19, 2020).  At present, there are only two confirmed active cases of COVID-19 at FCI Danbury.  *Id.*  However, one inmate has died.  *Id.*

Earlier this year, the district court in Connecticut issued decisions on a class action habeas corpus petition calling attention to the high risk of contracting COVID-

19 at FCI Danbury. *See Martinez-Brooks*, *supra*. Following *Martinez-Brooks*, several federal district courts have addressed the high risk of contracting COVID-19 at FCI Danbury. *See United States v. Calhoun*, No. 2:15-cr-00056-JDL-1, 2020 U.S. Dist. LEXIS 117527, at *7-8 (D. Me. July 1, 2020) (collecting cases). Indeed, as the *Calhoun* Court noted, "FCI Danbury was one of only three federal prisons specifically identified by Attorney General William Bar in an April 3, 2020 memo to the Director of the Bureau [of] Prisons ordering immediate action to place vulnerable inmates on home confinement." *Id.* at *7 (internal citations omitted). While assuming that the impossibility of effective social distancing remained unchanged from those early days and therefore presented heightened risk of contracting COVID-19, the district judge noted that as of July 1, 2020 "[i]t appears that the situation at FCI Danbury may have improved in the past six weeks." *Id.*

Although the loss of life at FCI Danbury from COVID-19 is tragic, much has changed at FCI Danbury since this spring. Currently, only 0.3 percent of inmates at FCI Danbury are known to have COVID-19 (2 ÷ 686 = .0029). *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Oct. 19, 2020). FCI Danbury's rate of inmates who have tested positive is higher, around ten percent (86 ÷ 876 = 0.098). *Id.* However, of the eighty-six positive tests among inmates, two are still infected and one died. *Id.* Thus, the vast majority of those infected with COVID-19 at FCI Danbury have recovered. The sixty-four prison staff members who contracted COVID-19 have also recovered. *Id.* There are no active cases among staff and there have been no deaths among staff. *Id.* Based on current statistics, the Court is

satisfied that although the COVID-19 outbreak at FCI Danbury, once severe and uncontained, is now under reasonable control.  *United States v. Khawaja*, 2020 U.S. Dist. LEXIS 169073, at \*14 (D.N.H. Sept. 16, 2020) ("[the] outbreak appears to be largely contained at the present").

Although FCI Danbury cannot eliminate the risk of contracting COVID-19, a risk also in society in general, the Court concludes that Mr. Cates has not demonstrated that the risk of contracting COVID-19 at FCI Danbury presents an extraordinary and compelling circumstance weighing in favor of Mr. Cates' release. In *United States v. Gates*, No. 2:08-cr-42-DBH-01, 2020 U.S. Dist. LEXIS 174704, at \*2-3 (D. Me. Sept. 23, 2020), a judge of this district observed that at least two circuits have explained that the "generalized fear of contracting COVID-19" does not on its own "demonstrate an extraordinary and compelling reason for granting compassionate release." *United States v. Urrabzo-Maldonado*, No. 20-3727, U.S. App. LEXIS 29873, at \*4-5 (6th Cir. Sept. 17, 2020) (citing *Raia*, 954 F.3d at 597), which observed that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release").

### 3.    FCI Danbury versus Winslow, Maine

If the Court were to release Mr. Cates, he would not enter a world free of COVID-19.  Accordingly, the Court must consider whether Mr. Cates has shown that his intended residence puts him at lower risk of contracting COVID-19 than at FCI Danbury.  His Amended Motion states that Mr. Cates "has established a safe release

plan for home confinement at his home in Winslow, Maine." *Def.'s Mot.* at 5. His petition to the BOP indicates that he plans to live with his wife at their home in Winslow and that he will initially be supported by his family in Winslow as he rebuilds his web design company. *BOP Pet.* at 7.

Mr. Cates submitted virtually no information from which the Court could meaningfully assess the relative risks of contracting COVID-19 at his family's home in Winslow versus FCI Danbury. Even assuming Mr. Cates would be better able to maintain social distance and limit his COVID-19 exposure from home than in federal prison, the Court cannot assess the extent to which risk reduction would occur. Therefore, the Court finds that Mr. Cates' risk of COVID-19 would likely be lower in Winslow than at FCI Danbury, but it lacks sufficient evidence to quantify the relative risks.

### D.     The Balance Weighs in Favor of Denying the Motion

In sum, the Court concludes that the factors discussed above weigh in favor of denying Mr. Cates' motion. Based on his history and the nature of his offense, the Court is persuaded that he presents an ongoing danger to the community. His offense was repugnant, and he derived sexual pleasure from the violent victimization of some of the most vulnerable members of our society. He has offered no evidence that would suggest he has been rehabilitated. Second, the § 3553(a) factors weigh against release. The Court's analysis of these factors is identical to its determination at Mr. Cates' sentencing. Third, COVID-19, as-applied to Mr. Cates does not present an extraordinary     and     compelling     circumstance     justifying     release     under

§ 3582(c)(1)(A)(i).  He has presented no evidence that his age or underlying health conditions, other than smoking, put him at increased risk of severe complications should he contract COVID-19.  He has also not persuaded the Court that he is at a heighted risk of contracting COVID-19 at FCI Danbury.  He has not offered sufficient evidence for the Court to conclude that his risk of contracting the virus would be appreciably lower if he were released to home confinement in Winslow, Maine.

## VI.    CONCLUSION

The Court DENIES Darrin Cates' Supplement to Motion to Reduce Sentence for Compassionate Release (ECF No. 130).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of October, 2020